Good morning, your honors. Michelle Betancourt on behalf of Mr. Salvador Villanueva. Your honors, the first thing I'd like to address is that Mr. Villanueva's conviction must be reversed. And I apologize before I get further. I'd like to reserve two minutes for rebuttal. Thank you. Mr. Villanueva's conviction must be reversed because there was a two-step interrogation that was conducted, as in Missouri v. Siebert. Recently, United States v. Williams tells us that when a two-step interrogation occurs, the district court must make a deliberateness determination and then also determine whether the subsequent Miranda warnings were, in fact, effective. I think in this case, my understanding is that the Supreme Court case, or the case that laid this out more completely, came after the district court's hearing. Is that correct? That's correct. Is this a case where it would need to not be necessarily reversed, but remanded so the district court could conduct a hearing and make findings that would be consistent? It does appear to be that way. I think we're very much parallel to the case in Williams. Williams had the similar situation where Missouri v. Siebert had not been decided yet. And so the court, although it went through and gave guidance to the district court, did remand it for further findings so that the district court could actually determine whether they, in fact, deliberately withheld Miranda warnings in the first interrogation. And then if that was true, then the court would then determine whether, in fact, the Miranda warnings were effective, the ones that were then later given. I do think there are objective factors that this court can look to in Mr. Villanueva's case. However, a remand would allow us to fully lay out the record so that the district court can make that finding in the first instance. Assuming that there was a Miranda violation in this case, why wasn't the error harmless in light of the evidence at trial? I think the error was not harmless because the main thing that was here is Mr. Villanueva's statements. They went to the heart of the case. I think Williams itself went through a harmlessness analysis. And in Williams, it was also the defendant's statements that were introduced. But here you have 25,000 designer labels, which is not the average thing that one brings across the border. And then you have the co-conspirator testimony. Beyond that, what would you need to convict? Well, Mr. Villanueva, in trial, did lay out plausible explanations for that. But again, I think Mr. Villanueva's statements went to the heart of the case. If those statements were not there, all that would be left were the co-conspirator's statement, which he had a motive, I think at cross-examination we attempted to lay out. He had a motive to maybe fabricate or to try to please the government in order to get the incentive, the benefit that he wanted. And in fact, did. He only served 29 days in custody compared to Mr. Villanueva, who was sentenced to 63 months. I think additionally, with respect to the harmlessness, I think Williams and also Fulamonte goes through that. The defendant's statements have a very profound impact on the jury. The jury could have made the determination on his statements alone. And to say that they ignored those and only looked to the other evidence presented is not for us to determine. I mean, it's the government's burden to prove beyond a reasonable doubt that this evidence would not have impacted the verdict. I think here Mr. Villanueva not only did not just give some statements, but he laid out basically his motive and intent, and those were all introduced. And the government relied on them in their closing argument in saying it wasn't just Mr. Salgado, the co-conspirator who testified, and it wasn't just that we found these labels, but you heard it out of his own mouth. You heard Mr. Villanueva's own statements when he came to the primary inspection area. You heard it when he told the agents. And so I think in the government using it, they themselves gave it more importance, and I don't think that the error here was harmless. And it should be remanded so that the court can further determine if there was deliberateness and whether the first set of Miranda warnings were in fact effective. What else do you want to talk to us about this morning? I think the other issue, I do want to stress that I think here, although there are objective factors that should be remanded, the second issue we have this morning is whether the court erred in denying the role adjustment. I think here that the court specifically said, just compared Mr. Villanueva to Mr. Salgado, the co-conspirator, and said that based on his, he just compared him to the co-defendant instead of comparing him to the entire conspiracy and the entire indictment. And the indictment, in fact, does state that there was Mr. Salgado, who was the co-conspirator, Mr. Villanueva, and other individuals, other unnamed individuals. And the district court in this case did not take into consideration the other individuals, at least not in his findings that were made. And there was plenty of evidence on the record. The district court also specifically just kept looking to the fact that if Mr. Villanueva had dropped out of it, this conspiracy would not have continued, which I don't necessarily, I don't believe that Rojas Milan tells us that that is sufficient. So I think that the court erred in denying him a minor role adjustment. It was given to the co-conspirator, who I believe here had a greater role than Mr. Villanueva, and he was given a role adjustment. Okay. Ms. Pearson? You'll have to speak up a bit. Okay. Sorry. Can you hear me now? Better, yes. I feel like the cellular phone commercial. The government's position here is that no reversal or remand is necessary because this is a case where there was simply overwhelming evidence against Mr. Villanueva, such that any additional trial is going to result in exactly the same effect. Mr. Villanueva crossed the border in a car that was registered to him. He had 25,000 counterfeit labels in him. The value of those counterfeit labels is many times the amount of money that he made in a year at his regular job, which was part of the testimony. And after the statement, he then came back six days later, and he had several recorded conversations with the person who he delivered the label to, and then he actually did a controlled delivery of the label, where he went to Mexico, picked up more counterfeit labels, a different manufacturer this time, came back to the United States with those labels. The agents followed him up to the Los Angeles area, where he delivered them to Mr. Salgado, and the agents thereafter arrested Mr. Salgado. And it was Mr. Salgado's testimony at trial which was so damning against Mr. Villanueva. And Mr. Salgado's testimony was corroborated by other documentary evidence, such as telephone records and bank records and hotel receipt records and the like. So, you know, the government's position here is that this is a case of overwhelming evidence. Even if you take away the gentleman's statement after Miranda, you still have all the evidence about the labels found in his possession and his controlled delivery and the recorded phone calls he made to the supplier. And I don't think that's a good point. To interrupt just a moment, he wouldn't have been able to make that controlled delivery for the government, which resulted in Salgado's arrest, if they hadn't had the statements he made in this disputed Miranda. Isn't that correct? I disagree with that position because I think that what the controlled delivery six days later says is that this is all completely voluntary. This man made definitive choices here because even when he came back six days later, it wasn't like he was represented by a lawyer who said, you've got to deal with the government, you've got to come forward and do this. He came forward six days later and made this controlled delivery. There was no one, you know, no agents picking him up, no agents hovering over him and coercing him into doing it. He voluntarily came forward and did this as a result of his voluntary statement. So I don't think that the controlled delivery is something that wouldn't come into evidence. It is true that you relied on the confession or the statements in closing argument and emphasized them, right? I did rely on them, certainly. The court had ruled that they were admissible evidence. CBER was not the law at that time, and I think I would have been remiss in not arguing them. So you'd have to say that at least the statements were at least probative. Absolutely. They certainly were one of the pieces of evidence I relied on in closing. But I think that even if you eliminated that piece of evidence, that there's still overwhelming evidence under which the jury would have convicted Mr. Villanueva. Why don't you talk about the minor role adjustment issue? With respect to the role enhancement, well, he didn't actually get a role enhancement. He simply didn't get the reduction, and the reduction is the defense burden to show to the court that he deserves a reduction. In fact, there are all sorts of factors that the court looked at in terms of the fact that he was present, for instance, during the sales negotiations between Ptolema, Salgado, and Escada, according to the testimony of Mr. Salgado, which was corroborated by the hotel receipts for the date of the conversation that Mr. Salgado was talking about. Is it true that Mr. Salgado got a minor role adjustment? To be honest with you, I don't recall specifically. I think the record is he did. I could be mistaken on that. It's quite possible. That I haven't looked at. Assuming that to be true, don't you find it odd that Mr. Salgado would get a minor role adjustment and Mr. Villanueva would not? No. Mr. Salgado was totally a middleman. He wasn't a manufacturer, and what Mr. Salgado did was deal with Mr. Villanueva, who brought over labels for him, and then Mr. Salgado sold the labels to other people who manufactured them. Meanwhile, the defendant was delivering labels not only for Salgado but for many other people, for different manufacturers. He was transporting labels for different suppliers, and he was also related to the source of the labels. He acknowledged that Mr. Salgado was his cousin, and in fact, that's probably why he was recruited for this. And Mr. Thomas had been dealing with Mr. Salgado and providing him with labels, and Salgado had been going to Mexico to get them. And then Salgado decided that that was too risky. He didn't want to do that anymore, and so Villanueva was introduced. And when Villanueva was introduced to deliver them, there was a delivery fee of like $0.10 a label that was tacked onto the price. And I think it's a reasonable conclusion to make that in addition to the $100 that they were per box that Mr. Villanueva was being paid for the delivery by Salgado, that he was also being paid that additional $0.10 a label by Mr. Thomas, because Mr. Thomas had no additional cost other than what it would cost Mr. Villanueva to transport them across the border in adding on that $0.10 a label. What about the – those are all factors to consider if you're looking at this role adjustment, but I think the argument made is that even though there could be that evidence, that the judge seemed to be comparing him solely to Salgado in the findings. And the question then is whether the judge was using the wrong legal standard, not whether he was misperceiving the evidence. Well, I think if you look at the judge's comments at sentencing as a whole, rather than, you know, parsing out his precise findings relative to role, you will see that he discusses all of the other potential co-conspirators in the course of sentencing. He talks about the label manufacturers. He talks about the Talamos of Mexico. He talks about the ultimate manufacturers in Los Angeles. During the course of the sentencing proceeding, he was considering all of those individuals. He did not specifically name them in the time that he was making the findings, but it's clear that he was mindful of those other players at the time he was sentencing the defendant. Well, he was – he certainly discussed it at sentencing, but I think the defendant is quite correct in saying there are no findings on that. Of what significance is that? Well, I think that the court – you know, I know that the judges are required to make findings, but their findings I don't think need to be quite that – I don't think the law requires quite that degree of specificity. I think it's just that you have to, in looking at the judge's comments as a whole, you have to understand that he is considering the factors that he should consider. Okay. Any further questions? I think we have your argument at hand. Thank you. We'll have rebuttal. Thank you, Your Honors. Your Honors, I'd like to address a few of the issues with respect to role. I think the government tries to say that Mr. Salgado is merely a middleman and that Mr. Villanueva is much more than that. I would disagree with that statement. At ER page 249 of the excerpt of record, Mr. Salgado was in fact the one who contacted Martín Vega, who was the individual where the control delivery labels were at. He contacted him, then told Mr. Villanueva, the labels are ready for you. Mr. Villanueva then goes and picks them up. Mr. Salgado again contacts Martín Vega, tells him, Mr. Villanueva is the one that's coming to pick up the labels. So I would disagree with the characterization that Mr. Salgado is merely a middleman. Mr. Salgado, in fact, is telling Mr. Villanueva where to go pick up the labels, where the labels are going to be. And so when the government says that Mr. Villanueva knew much more, I think it's an incorrect characterization. Additionally, Mr. Villanueva, although he's related to the individual who was manufacturing labels, I don't think that says anything more about his role that it wasn't minor in this case. And then the government's comment regarding that he was receiving a percentage of this, I think, is merely an assumption on the government's part. There is no evidence in the record that Mr. Villanueva was, in fact, receiving a cut or a larger percentage. I think it was just a calculation that the government figured based on what his income was and what the increase in price was. There was no evidence from Mr. Salgado whether Mr. Villanueva was getting an additional cut. Aside from that, Your Honor, I don't have anything further. I just would ask that this case be remanded. I think there are objective factors that the Court can look to here, but I think remanding it down to the district court in terms of the Miranda issue would make a more complete record, and the district court would be able to determine whether, in fact, it was a deliberate withholding of the Miranda warnings in the initial case. Thank you, counsel. Thanks. The case just heard will be submitted. Thank you both for your arguments. And thank you for the opportunity to appear by telephone. Certainly. I'm glad we were able to arrange that.
judges: Thomas, McKeown, King